PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

FRANK ERVIN ALTIZER, JR.,
Plaintiff-Appellee,

v.

GEORGE DEEDS,
Defendant-Appellant,

No. 97-7111

and

RICHARD FLEMING; SERGEANT
MINTON,
Defendants,

STEVEN H. GOLDBLATT,
Amicus Curiae.

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
James C. Turk, District Judge.
(CA-96-68-R)

Argued: March 2, 1999

Decided: September 7, 1999

Before WIDENER, WILLIAMS, and MICHAEL, Circuit Judges.

_____

Reversed by published opinion. Judge Williams wrote the majority
opinion, in which Judge Widener joined. Judge Michael wrote a dis-
senting opinion.

_____

**COUNSEL**

**ARGUED:** Pamela Anne Sargent, Assistant Attorney General, Criminal Law Division, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellant. Ashley N. Bailey, Student Counsel, Appellate Litigation Program, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Amicus Curiae. **ON BRIEF:** Mark L. Earley, Attorney General, Criminal Law Division, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellant. Steven H. Goldblatt, Director, Christopher M. Anzidei, Student Counsel, Jeremy G. Suiter, Student Counsel, Appellate Litigation Program, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Amicus Curiae.

_____

**OPINION**

WILLIAMS, Circuit Judge:

George Deeds, warden of the Keen Mountain Correctional Center (KMCC), appeals, through the Attorney General for the Commonwealth of Virginia, the district court's order granting Frank Altizer, a Virginia prisoner, partial summary judgment in Altizer's 42 U.S.C.A. § 1983 (West Supp. 1999) action alleging interference with his outgoing mail. The district court held that Warden Deeds's practice of routinely opening and inspecting outgoing mail for contraband without any particularized suspicion, from sometime in 1994 until January 1996, violated Altizer's free speech rights under the First Amendment. On appeal, we conclude that Warden Deeds's practice of opening and inspecting Altizer's outgoing mail was reasonably related to legitimate penological interests, and, therefore, constitutional. Accordingly, we reverse.

I.

Altizer, a Virginia inmate and one of this Court's most frequent filers,[1]

_____

[1] Since 1973, when he was sentenced to two life terms for the abduction and rape of an eleven-year-old girl, Altizer has filed at least 107

2

filed suit against Warden Deeds pursuant to 42 U.S.C.A. § 1983 (West Supp. 1999). In his rambling pro se complaint Altizer alleged, among other things, that Warden Deeds violated his constitutional rights by ordering prison officials to open and inspect his outgoing mail -- one piece of which contained a homemade knife -- for contraband. Altizer sought injunctive and monetary relief.

Warden Deeds filed an answer, a motion to dismiss, a motion to strike, a motion for sanctions, and a supplemental motion to dismiss. The district court notified Altizer of the motion to dismiss pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975). Altizer responded by filing two short briefs. After reviewing the record, the district court granted Warden Deeds's motion to dismiss in part and denied it in part. The district court also denied Warden Deeds's other motions.

In so ruling, the district court -- after initially describing the complaint as "nonsensical" -- charitably construed Altizer's complaint as raising the following allegation:

> On January 7, 1996, Altizer was informed that any legal mail he addressed to "a clerk of court, two (2) state assistant attorneys general, and one attorney had to be opened, inspected and read, before it would be delivered" to the KMCC mailroom for processing. This policy was implemented by [Warden] Deeds only as to Altizer and inmates for whom he had provided legal assistance, in retaliation for Altizer's activities as a "writ writer" and for his prosecution of Altizer v. Angelone, Civil Action No. 96-0003-R.[2]

_____

unmeritorious lawsuits in federal and state court. In fact, Altizer had at least seven lawsuits dismissed as frivolous in the six-month period directly preceding the filing of the instant suit. In an interview with the Roanoke Times & World-News, Altizer referred to his penchant for filing lawsuits as "part of the game," and stated that he had no plans to quit filing lawsuits while incarcerated. See Michael Stowe, Prisoners Making the Most of Their Right to File Suit, Roanoke Times & World-News, Dec. 27, 1994, at A1.

[2] Civil Action 96-0003-R was filed in federal district court on January 3, 1996, and immediately dismissed as frivolous pursuant to 28 U.S.C.A.

3

(J.A. at 145 (construing Complaint ¶¶ 1-5, 7-9, & 15).)[3] The district court concluded that this allegation, construed in the light most favorable to Altizer, possibly stated violations of the Equal Protection Clause and the First Amendment. Moreover, the district court concluded that Warden Deeds was not entitled to qualified immunity and that Altizer's suit was not barred by the "three strikes" provisions of 28 U.S.C.A. § 1915(g) (West Supp. 1999).

---

§ 1915(d) (recodified at 28 U.S.C.A. § 1915(e) (West Supp. 1999)) (providing for the dismissal of a complaint filed in forma pauperis that "is frivolous or malicious"). In that complaint, Altizer alleged that officials of the Virginia Department of Corrections had violated his constitutional rights by not delivering the mail on Saturdays. Apparently Altizer believed that he had a federally protected liberty interest in receiving mail within twenty-four hours after its delivery by the postal service to the prison. Not surprisingly, Altizer's complaint was dismissed by the district court under § 1915(d) as frivolous. See generally Neitzke v. Williams, 490 U.S. 319, 327 (1989) (holding that a complaint filed in forma pauperis may be dismissed under § 1915(d) if it is based upon an "indisputably meritless legal theory" or "clearly baseless" factual contentions). Because the action was dismissed pursuant to § 1915(d), the complaint was never served on Warden Deeds.

3 The district court construed Altizer's rambling complaint to raise several additional claims, all of which were dismissed for either failing to state a claim upon which relief could be granted, lack of standing, or being utterly frivolous. Altizer, among other things, complained of a criminal conspiracy against him. The alleged conspiracy consisted of several district court judges, a federal magistrate judge, the district court clerk, several deputy clerks and law clerks, state clerks of court, and every attorney licensed to practice law in the Commonwealth of Virginia. Altizer also complained that he was not allowed to provide assistance to Ronnie Dean Jones in the prosecution of his lawsuits. According to Altizer, he "is possessed of the moral obligation to provide assistance to Mr. Jones [because it] is an indispensable tenet of [his] [C]hristian faith . . . to provide assistance to those unable to defend themselves against the presumptively egregious heathen operation of government." (J.A. at 51.) Because Altizer failed to file a cross-appeal, these additional claims are not before us. See El Paso Natural Gas Co. v. Neztsosie, 119 S. Ct. 1430, 1434-35 (1999) (noting well-established rule that court of appeals may not take up the unappealed portions of a district court's order).

After a lengthy period of discovery, the parties filed cross motions for summary judgment.[4] On June 13, 1997, the district court granted both motions in part and denied both motions in part. Of particular importance here, the district court granted summary judgment for Altizer in part, finding that Warden Deeds had violated Altizer's First Amendment right to freedom of speech by opening and inspecting every piece of his outgoing mail.[5] Because Altizer had alleged no factual basis for compensatory or punitive damages, however, the district court awarded him only $1.00 in nominal damages. [6]

Both parties filed motions for reconsideration. In Warden Deeds's motion, he once again argued that Altizer's suit was barred by the "three strikes" provisions of § 1915(g). In support, Warden Deeds submitted records of Altizer's prior litigious history reflecting that Altizer had far more than three actions dismissed as frivolous by the district court alone. The district court had previously found the "three strikes" provision inapplicable because Altizer filed his action on January 23, 1996, approximately three months before the effective date of the Prison Litigation Reform Act (PLRA), which amended § 1915(g). In its opinion on reconsideration, the district court noted

_____

[4] Altizer filed a document entitled "Reply and Memorandum for Summary Judgment." (J.A. at 388.) Although Altizer subsequently indicated that he was only replying to Warden Deeds's motion for summary judgment, the district court construed the filing as a summary judgment motion on Altizer's behalf.

[5] The district court granted Warden Deeds summary judgment in part, finding that Altizer failed to allege facts that would permit either an equal protection or retaliation claim to go forward. Altizer did not cross-appeal this ruling.

[6] Despite finding that Warden Deeds had violated Altizer's First Amendment right to freedom of speech, the district court denied Altizer's motion for injunctive relief on the ground that his subsequent transfer from KMCC to Greensville Correctional Center rendered his request for such relief moot. See, e.g., Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) (holding that prisoner's transfer to another facility mooted his claims for declaratory and injunctive relief); Taylor v. Rogers, 781 F.2d 1047, 1048 n.1 (4th Cir. 1986) (holding that prisoner's transfer from protective custody to the general prison population mooted a request for declaratory and injunctive relief). Altizer did not cross-appeal this ruling.

that Warden Deeds provided no retroactivity "analysis" in his motion to dismiss, and could not raise specific supporting arguments in support of a motion for relief from judgment. Subsequently, however, the district court granted Warden Deeds's motion for stay of its order pending a decision by this Court on Warden Deeds's appeal.

On appeal, Warden Deeds vigorously pursues the district court's failure to apply the PLRA's "three strikes" provision to Altizer's complaint. In addition, Warden Deeds argues that the district court erred in holding that the First Amendment bars prison officials from opening and inspecting an inmate's outgoing mail. In the alternative, Warden Deeds contends that such a right was not clearly established and that, as a result, he was entitled to qualified immunity. Warden Deeds also argues that the district court erred in awarding Altizer $1.00 in damages because Altizer failed to demonstrate that the mail allegedly interfered with was his own. Finally, Warden Deeds argues that the district court granted summary judgment to Altizer in large part due to pleadings and other documents that Altizer failed to serve on counsel for Warden Deeds in direct violation of Rule 5(a) of the Federal Rules of Civil Procedure. We address these claims in turn.**7**

_____

**7** This Court appointed the Georgetown University Law Center Appellate Litigation Program to represent Altizer on appeal. Altizer, however, directed his court-appointed counsel to cease representing him. Although we granted the motion of Altizer's counsel to withdraw from further representation, we also granted the Appellate Litigation Program leave to file its brief as amicus curiae. Indeed, because of the significant legal questions presented in Warden Deeds's appeal, we granted Amicus leave to file a brief in conformity with the rules governing appellees, leave to file a supplemental appendix, and leave to participate in oral argument. See Fed. R. App. P. 29(d), (g). We recognize, of course, that an appellee need not file a brief on appeal. See Fed. R. App. P. 31(c) (providing that the only consequence of an appellee's failure to file a brief is that the appellee "will not be heard at oral argument unless the court grants permission"). Nevertheless, we are benefitted by an adversary presentation of the issues raised by an appellant. As a result, federal courts have frequently appointed amici to participate in an appeal where a party will not brief an important position. See, e.g., Bousley v. United States, 118 S. Ct. 1604, 1609 (1998) (inviting private party to file an amicus brief and to participate in oral argument when the Government declined to defend ruling in its favor); Bob Jones Univ. v. United States, 461 U.S. 574, 585

6

II.

On appeal, we must first consider whether the "three strikes" provision of the PLRA applies retroactively to a prison litigant who filed his § 1983 action before the PLRA's effective date. Altizer filed the § 1983 action forming the basis for this appeal on January 23, 1996, prior to the enactment of the PLRA. In accordance with pre-PLRA law, a magistrate judge granted Altizer's request to proceed in forma pauperis (IFP) on April 22, 1996.[8] Under pre-PLRA law, a prisoner granted IFP status did not have to pay any filing fees when bringing a § 1983 action.

On April 26, 1996, the PLRA was enacted into law. Section 804 of the PLRA amended 28 U.S.C.A. § 1915. As a result, prisoners proceeding IFP are now required to pay the full filing fee. IFP status simply allows a prisoner to pay the filing fee in installments. See 28 U.S.C.A. § 1915(b) (West Supp. 1999). Further,§ 804 of the PLRA created a new subsection (g), which reads as follows:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while

_____

n.9, 599 n.24 (1983) (same); United States v. Dickerson, 166 F.3d 667, 680 n.14 (4th Cir. 1999) (granting the Washington Legal Foundation and the Safe Streets Coalition leave to file an amicus brief and to participate in oral argument in light of the Government's unwillingness to defend the constitutionality of 18 U.S.C.A. § 3501 (West 1985)); McKinney v. Indiana Michigan Power Co., 113 F.3d 770, 772 n.2 (7th Cir. 1997) (appointing amicus "so that [the court] might have the benefit of an adversary presentation of the issues raised by the appeal"); United States v. Chagra, 701 F.2d 354, 366 (5th Cir. 1983) (appointing amicus "[t]o ensure that this appeal continues to be presented in an adversary context"). We thank Amicus for its participation.

[8] Altizer was unable to contain his disdain for the judicial system while applying for IFP status. When specifically asked to identify the source of any money received during the preceding twelve months, Altizer informed the district court that he had received $20.00 from "an acquaintance," but that "any identity beyond that is none of your business." (J.A. at 23.)

incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C.A. § 1915(g).

On May 6, 1996, Warden Deeds filed a motion to dismiss on the grounds that Altizer's suit was barred by the "three strikes" provision of § 1915(g). With the motion to dismiss, Warden Deeds attached the final orders from the last seven cases filed by Altizer -- all of which were filed within the six months preceding the instant case -- showing that all seven were dismissed as frivolous by the district court. In fact, there is evidence that Altizer has filed at least 107 unmeritorious lawsuits in federal and state court since he was incarcerated.[9]

On August 26, 1996, the district court denied Warden Deeds's motion to dismiss. In particular, the district court found the "three strikes" provision inapplicable because Altizer filed his action on January 23, 1996, approximately three months before the effective date of the PLRA. On June 23, 1997, Warden Deeds moved the district court to reconsider its "three strikes" ruling. In its opinion denying Warden Deeds's motion for reconsideration, the district court noted that Warden Deeds had provided no retroactivity"analysis" in his motion to dismiss.

All five Circuit Courts of Appeals that have addressed whether actions that have been dismissed as frivolous prior to the effective date of the PLRA count toward an inmate's three strikes have answered the question affirmatively. See Tierney v. Kupers, 128 F.3d

_____

[9] As the frequent filer of frivolous lawsuits, Altizer appears to be the precise type of inmate that Congress had in mind when it passed the PLRA. That the district court -- after charitably construing Altizer's rambling complaint to state a claim upon which relief could be granted -- found a meritorious claim in this case does not, as Amicus suggests, reveal the unfairness of the PLRA's "three strikes" provision. Just because a broken clock is right twice a day does not mean that it should go unrepaired.

1310, 1312 (9th Cir. 1997); <u>Keener v. Pennsylvania Bd. of Probation & Parole</u>, 128 F.3d 143, 144 (3d Cir. 1997); <u>Adepegba v. Hammons</u>, 103 F.3d 383, 387 (5th Cir. 1996); <u>Abdul-Wadood v. Nathan</u>, 91 F.3d 1023, 1025 (7th Cir. 1996); <u>Green v. Nottingham</u> , 90 F.3d 415, 419-20 (10th Cir. 1996). Only two of these courts, however, directly addressed whether the three strikes provision could be applied to a litigant who filed his civil action before the effective date of the PLRA. The Fifth Circuit barred such an action in <u>Adepegba</u>, while the Seventh Circuit allowed the action to proceed in <u>Abdul-Wadood</u>.**10** Thus, while all of our sister circuits agree that § 1915(g) counts lawsuits dismissed as frivolous prior to the effective date of the PLRA as "strikes," the circuits are split as to whether the "three strikes" provision applies to a lawsuit filed prior to the effective date of the statute.

The question of whether to apply a new statute to a case pending on its effective date is governed by the Supreme Court's opinion in <u>Landgraf v. USI Film Products</u>, 511 U.S. 244 (1994). <u>Landgraf</u> established a two-part test to determine whether the statute should apply retroactively. First, the court should determine"whether Congress has expressly prescribed the statute's proper reach." <u>Id.</u> at 280. If it has, the court must respect the stated will of Congress. <u>See id.</u> Second, in instances where the statute does not contain an express effective date, the court must determine whether the statute would"impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." <u>Id.</u> If it does, the court should not apply the statute to the pending case. <u>See id.</u>

Applying the <u>Landgraf</u> analysis here, we first note that Congress failed to specify an effective date for § 804 of the PLRA. <u>Cf. Martin v. Hadix</u>, 119 S. Ct. 1998, 2004-05 (1999) (noting that Congress failed to specify an effective date for § 803 of the PLRA). As a result, this Court must apply the default rule that the PLRA became effective

_____

**10** **Green v. Nottingham**, 90 F.3d 415 (10th Cir. 1996), dealt with a mandamus petition filed after the effective date of the statute. In <u>Tierney v. Kupers</u>, 128 F.3d 1310 (9th Cir. 1997), the litigant filed his actions after the effective date, and in <u>Keener v. Pennsylvania Bd. of Probation & Parole</u>, 128 F.3d 143 (3d Cir. 1997), the court did not state when the litigant's action was filed.

9

on the day it was enacted into law, see 2 Norman J. Singer, Sutherland Statutory Construction, § 33.06 at 12 (5th ed. 1993), and proceed to the second step in the Landgraf analysis.

It is not readily apparent that applying the provisions of § 1915(g) in this case would run afoul of the second step of Landgraf, however. As the Fifth Circuit has noted, there is no absolute"right" to IFP status. See Startti v. United States, 415 F.2d 1115, 1116 (5th Cir. 1969). Furthermore, every limitation of a privilege does not count as a liability or a duty. Section 1915(g) arguably governs procedure, and it does little more than apply the same rules to prisoners that apply to everyone else who brings an action or appeal. It is well settled that "[c]hanges in procedural rules may often be applied in suits arising before their enactment without raising concerns about retroactivity." Landgraf, 511 U.S. at 275. The Supreme Court has long held that, because rules of procedure govern secondary conduct rather than primary conduct, applying such rules to cases pending on their effective date does not necessarily violate the presumption against retroactivity. See id. (citing McBurney v. Carson, 99 U.S. 567, 569 (1878)). But see Martin, 119 S. Ct. at 2006-07 (holding that the PLRA's new attorneys' fees provision, although governing secondary conduct, could not be applied retroactively). As a result, the Supreme Court has upheld procedural changes even where they work to the disadvantage of defendants in pending cases. See Landgraf, 511 U.S. at 275 n.28 (citing Dobbert v. Florida, 432 U.S. 282, 293-94 (1977); Collins v. Youngblood, 497 U.S. 37 (1990); Beazell v. Ohio, 269 U.S. 167 (1925)).**11**

_____

**11** According to the Fifth Circuit:

> Section 1915 is a procedural statute governing the process by which indigent individuals, including prisoners, bring civil actions or appeals in the federal courts. Before amendment, § 1915 allowed qualifying prisoners to bring an action or appeal without prepaying court fees, which are normally in excess of $100. See 28 U.S.C. § 1913 note (Judicial Conference Schedule of Fees). The amended provisions of section 1915(b) allow qualifying individuals to pay the filing fee in installments over time. 28 U.S.C. § 1915(b), as amended. Although section 1915(g) attaches consequences to past actions, we find that these consequences are matters of procedure. Section 1915(g) does not

Prior to hearing arguments in this case, however, a panel of this Court decided Church v. Attorney Gen., 125 F.3d 210 (4th Cir. 1997). In Church, this Court held that the filing fee provisions codified at § 1915(b)(1) did not apply in a case where the prisoner had already filed his action and appeal before the effective date of the PLRA. See id. at 215. Although this Court did not address the retroactivity of § 1915(g)'s "three strikes" provision, the Court in Church did specifically hold that requiring a prisoner to pay a filing fee that he was not required to pay when he filed his appeal impaired that prisoner's rights, and, therefore, had an impermissibly retroactive effect. See id. at 213. Moreover, the panel in Church specifically held that the imposition of a new filing fee requirement was not simply a procedural alteration. See id.

Warden Deeds concedes, as he must, that retroactive application of the "three strikes" provision in this case would require Altizer to pay a filing fee that he was not required to pay when he filed his appeal. Such an application, we are constrained to hold, would be inconsistent with this Court's prior holding in Church. Indeed, even Warden Deeds concedes that the reasoning in Church, which he describes as plainly incorrect, is directly contrary to his position on appeal. Cf. Martin, 119 S. Ct. at 2007 (holding that the PLRA's limitation on attorneys' fees may not be applied to services performed prior to the PLRA's enactment). Not seeing any principled way to distinguish the two cases, we conclude that the panel is bound by this Court's decision in Church. See Industrial Turnaround Corp. v. NLRB, 115 F.3d 248, 254 (4th Cir. 1997) (noting that a decision of this Court is binding on other panels unless it is overruled by a subsequent en banc opinion of the Court or an intervening decision of the United States Supreme Court). Accordingly, the district court did not err in deter-

---

affect a prisoner's substantive rights, and it does not block his or her access to the courts. A prisoner may still pursue any claim after three qualifying dismissals, but he or she must do so without the aid of the [IFP] procedures. We therefore find that application of this procedural rule to pending appeals does not raise the retroactivity concerns discussed in Landgraf .

Adepegba v. Hammons, 103 F.3d 383, 386 (5th Cir. 1996).

11

mining that Altizer's suit was not barred by the"three strikes" provision of § 1915(g).

III.

Next, Warden Deeds argues that the district court erred in holding that the First Amendment bars prison officials from routinely inspecting an inmate's outgoing mail for contraband. In the alternative, Deeds contends that the district court has, in effect, created a new rule of constitutional law: There exists an absolute First Amendment prohibition against routinely opening and/or inspecting inmates' outgoing mail. As such, Deeds argues that he is entitled to qualified immunity. Accordingly, Warden Deeds contends that the district court erred in granting summary judgment to Altizer.

We review de novo the district court's decision to grant Altizer summary judgment. See Halperin v. Abacus Tech. Corp., 128 F.3d 191, 196 (4th Cir. 1997). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In deciding whether there is a genuine issue of material fact, the evidence of the nonmoving party is to be believed and all justifiable inferences must be drawn in his favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). With these principles in mind, we address the district court's First Amendment ruling.

Altizer's complaint is a rambling narrative that fails to set forth any individual claims. As a result, the district court construed the complaint to raise several specific claims. Among those claims was the following:

> From September 1994 until January 1996, Deeds knew of and sanctioned the policy requiring security officers to open, inspect and read all of Altizer's outgoing mail, in violation of the First Amendment.

(J.A. at 328.) Finding that outgoing mail implicates fewer security

12

concerns than incoming mail, the district court concluded that the standard established in <u>Procunier v. Martinez</u>, 416 U.S. 396 (1974), should apply to every prison policy affecting outgoing prisoner mail.**12** Under that standard, the district court held that Warden Deeds's practice of opening and inspecting each outgoing letter from every inmate did not further an important or substantial governmental interest, and, therefore, violated the First Amendment. For the reasons that follow, we conclude that the district court applied the incorrect standard.

There is little doubt that the opening and inspecting of an individual's mail by a governmental entity would raise grave First Amendment concerns outside the prison context. However, it is well established that a prison rule that impinges on an inmate's constitutional rights is valid "if it is reasonably related to legitimate penological interests." <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987). Without question, the opening and inspecting of an inmate's outgoing mail is reasonably related to legitimate penological interests, and, therefore, constitutional, and the cases cited by the district court are not to the contrary.

<u>Martinez</u>, as well as the other case cited by the district court, <u>see</u> <u>Thornburgh v. Abbott</u>, 490 U.S. 401 (1989), involved the "censorship" of inmate mail, not the "inspection" of inmate mail. Specifically, the Supreme Court in <u>Martinez</u> struck down a California regulation concerning personal correspondence between inmates and non-inmates; regulations that provided for censorship of letters that "unduly complain," "magnify grievances," or "expres[s] inflammatory political, racial, religious or other views or beliefs." 416 U.S. at 399.

_____

**12** The Supreme Court reviewed the prison regulations at issue in <u>Martinez</u> under the following standard:

> First, the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression. Prison officials . . . must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order, and rehabilitation. Second, the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved.

<u>Procunier v. Martinez</u>, 416 U.S. 396, 413 (1974).

13

Under the standard established in Martinez, and applied by the district court in the instant case, the Supreme Court determined that the regulations in question were not essential to the protection of an important or substantial governmental interest.

Nevertheless, the Supreme Court in Martinez specifically held that the censorship of certain materials was essential to the protection of substantial governmental interests. For example, the Supreme Court specifically noted that personal correspondence that included the following kinds of material could be censored: (1) that which might violate postal regulations, e.g., threats, blackmail, or contraband; (2) that which indicates a plot to escape; (3) that which discusses criminal activities; (4) that which indicates that the inmate is running a business while he is in confinement; or (5) that which contains codes or other obvious attempts to circumvent legitimate prison regulations. See id. at 414 n.14.

Implicit in the Supreme Court's ruling in Martinez -- that some kinds of outgoing mail may be censored -- is that inmates' outgoing mail may be opened and inspected by prison officials. Otherwise, a prison official would never know that a letter contained the very type of material that, according to the Supreme Court, could rightfully be censored, i.e., correspondence sent by an inmate that would be detrimental to the security, good order, or discipline of the institution; necessary for the protection of the public; or used to facilitate criminal activity. Indeed, the Supreme Court noted as much in Wolff v. McDonnell, 418 U.S. 539 (1974), when it pointed out that "freedom from censorship is not equivalent to freedom from inspection or perusal." Id. at 576. Accordingly, we believe that the district court should have used a standard more deferential to the judgment of prison authorities than the standard contained in Martinez. Specifically, we hold that the proper inquiry in this case is whether Warden Deeds's decision to open and inspect Altizer's outgoing mail was "reasonably related to legitimate penological interests." Turner, 482 U.S. 78 (1987).

We are reassured in our conclusion -- that the more deferential Turner standard should apply here -- by the Supreme Court's decision in Thornburgh, 490 U.S. 401. In Thornburgh, the Supreme Court declined to extend the Martinez standard of review to regulations

14

dealing with the censorship of incoming mail. See id. at 404. Rather, the Supreme Court determined that the regulations in question should be reviewed under the Turner standard. See id. Of particular importance here, the Supreme Court limited the Martinez standard to the facts of that case, i.e., regulations concerning the censorship of outgoing personal correspondence from prisoners. See id. at 413.**13**

Because there is a substantial governmental interest in censoring certain materials from an inmate's outgoing mail, e.g., materials detrimental to the security, good order, and discipline of the institution, or

_____

**13** The dissent complains that our refusal to apply the Martinez standard in this case is "unprecedented." Post at 18. With all due respect to our dissenting colleague, extending the Martinez standard beyond the facts of that case would be unprecedented. Since deciding Martinez, the Supreme Court has adopted a different standard for reviewing constitutional rights in the prison context. See Turner v. Safley, 482 U.S. 78, 89 (1987). Indeed, since Turner, every Supreme Court decison involving "prisoner rights" has applied the Turner standard of review, which focuses on the reasonableness of the prison official's actions; not one Supreme Court decision has applied the Martinez standard, which focuses on whether the prison offical's actions were necessary to further a substantial governmental interest, i.e., strict scrutiny. Thus, rather than applying strict scrutiny to Warden Deeds's actions, as the dissent urges, the relevant inquiry is simply whether Warden Deeds's actions were "reasonably related to legitimate penological interests." Id. at 89.

The dissent also complains that Abbott's clear language does not limit Martinez to the context of cases involving censorship of outgoing mail. Post at n.2. However, when taken as a whole, Abbott could not have been clearer in its repudiation of Martinez outside of that context. The dissent attempts to bolster its claim that Martinez is not limited to the censorship of outgoing mail by quoting from a portion of the following sentence from Abbott: "[W]e acknowledge today that the logic of our analyses in Martinez and Turner requires that Martinez be limited to regulations concerning outgoing correspondence." Abbott, 490 U.S. at 413. The dissent does not mention that the Court, in its discussion of the facts of Martinez, makes it absolutely clear what kind of regulations were at issue in Martinez: "regulations that provided for the censorship of letters." Id. at 408 (emphasis added). Whatever remains of Martinez after Abbott concerns only the censorship of outgoing mail. Actions such as inspecting Altizer's outgoing mail and removing a homemade knife from it do not constitute impermissible censorship.

15

dangerous to the public, there is <u>a fortiori</u> a legitimate penological interest in opening and inspecting an inmate's outgoing mail for such material. Thus, although an inmate's First Amendment rights <u>may</u> be violated when his outgoing mail is censored, his First Amendment rights are not violated when his outgoing mail is simply opened and inspected for, among other things, contraband, as was the case here.**14** Indeed, the obvious need to inspect Altizer's outgoing mail is underscored by his attempt -- during the pendency of this very case -- to mail a homemade knife to the Deputy Clerk of the United States District Court for the Western District of Virginia. Because the opening and inspecting of Altizer's outgoing mail was reasonably related to a legitimate penological interest,**15** the district court erred in finding that Altizer's First Amendment rights were violated. **16**

_____

**14** Inspecting an inmate's legal mail may implicate the inmate's Sixth Amendment right to communicate freely with his attorney in a criminal case. <u>See Wolff v. McDonnell</u>, 418 U.S. 539, 575 (1974). As the district court noted, however, Altizer has not alleged that he was communicating with an attorney concerning any pending criminal matters.

**15** We note that the contrary holding -- that the opening and inspecting of an inmate's outgoing mail is <u>not</u> reasonably related to legitimate penological interests -- would have far-reaching consequences. In light of the Supreme Court's recognition that prison officials must be able to reject correspondence sent by an inmate that would be detrimental to the security, good order, or discipline of the institution; necessary for the protection of the public; or used to facilitate criminal activity, the Federal Bureau of Prisons has been given the authority to read and inspect the outgoing mail of every inmate residing in a medium or high security prison. <u>See</u> 28 C.F.R. § 540.14(c)(2) (1998) (noting that all outgoing mail "may be read and inspected by staff"). Thus, if the district court were to be affirmed, not only would we be finding Warden Deeds's actions to be unconstitutional, but we would necessarily be finding the actions of every federal prison within our jurisdiction in the Fourth Circuit to be unconstitutional. Aware of this possibility, the dissent simply suggests that the opening and inspecting of outgoing mail in federal prison is constitutional because of 28 C.F.R. § 540.14. <u>See post</u> at 20 n.3. We find it difficult to believe that the mere absence of a similar policy at KMCC rendered Warden Deeds's actions unconstitutional or, for that matter, that the enactment of a similar policy could protect unconstitutional conduct.

**16** Having concluded that Warden Deeds's practice of routinely opening and inspecting outgoing mail for contraband was reasonably related to a

16

IV.

For the foregoing reasons, the decision of the district court is reversed.

REVERSED

MICHAEL, Circuit Judge, dissenting:

While I agree with the majority's conclusion that Altizer's suit was not barred by 28 U.S.C. § 1915(g), I respectfully dissent from its holding that the opening and inspection of outgoing prisoner mail automatically passes constitutional muster.**1**

In Procunier v. Martinez, 416 U.S. 396 (1974), the Supreme Court considered the constitutionality of regulations governing incoming and outgoing prisoner mail. The Court held that in order to pass muster under the First Amendment, prison mail regulations "must further an important or substantial governmental interest." Id. at 413. "Security, order, and rehabilitation" are the only three governmental interests that were recognized as "substantial." Id . The scope of this holding was subsequently limited by the Supreme Court in Thornburgh v. Abbott, 490 U.S. 401 (1989). In that case the Court carefully drew a distinction between incoming and outgoing prisoner mail, concluding that a lower level of scrutiny should be applied in reviewing prison regulations governing incoming mail. Regulations governing incoming mail are valid if they are "reasonably related to legitimate penological interests." Id. at 413 (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)). The Abbott Court ruled that"Martinez [would] be limited to regulations concerning outgoing correspondence." Id. This contin-

_____

legitimate penological interest, and, therefore, constitutional, we have no reason to consider Warden Deeds's additional assignments of error, i.e., that he is entitled to qualified immunity, that the district court erred in awarding Altizer $1.00 in damages, and that Altizer failed to serve counsel for Warden Deeds with certain pleadings in violation of Rule 5(a) of the Federal Rules of Civil Procedure.

**1** I accept the majority's conclusion on these facts that Altizer's Sixth Amendment right to counsel was not implicated by the opening and inspection of his outgoing legal mail. See ante  at n.14.

17

ued heightened scrutiny for the regulation of outgoing mail is justified by the "categorically lesser" implications this mail has for prison security. See id.

The majority today substantially alters this prescription. It does so by limiting the heightened scrutiny required by Martinez only to cases involving censorship of the contents of outgoing prisoner mail. This additional limitation on Martinez is unprecedented. The majority also ignores the broader language of Abbott, which says that Martinez continues to apply to "regulations concerning outgoing correspondence." Abbott, 490 U.S. at 413. The Martinez standard therefore governs the treatment of outgoing mail in this case. As a result, the warden should be required to show that the practice of opening and inspecting all outgoing mail furthered "an important or substantial governmental interest," namely, security, order, or rehabilitation. See Martinez, 416 U.S. at 413.**2**

Altizer has been incarcerated at the Keen Mountain Correctional Center, an "adult institution" operated by the Commonwealth of Virginia's Department of Corrections (VDOC). Since June 1990 the VDOC has had a written policy or procedure governing the inspection of prisoner mail at adult institutions. Under that policy, an inmate's outgoing legal mail "will not be opened, inspected or read in any manner." An exception permits the reading of outgoing prisoner mail if "there is reasonable belief that the mail is being used in violation of State or Federal law or for purposes which threaten the security of the facility." This policy was violated for a time at Keen Mountain, where officers opened and inspected every piece of the inmates' outgoing legal mail. The initiation date of the blanket "open and inspect"

_____

**2** Unless censorship of outgoing personal mail is involved, the majority contends that the Turner standard now governs the review of "constitutional rights in the prison context." Ante at n.13. That extends Turner too far because Abbott, which was decided two years after Turner, preserves more of Martinez than the majority is willing to recognize. In Abbott the Supreme Court analyzed Martinez and Turner at length and noted that Martinez (with its heightened standard of scrutiny) would continue to apply "to regulations concerning [the] outgoing correspondence" of prisoners. Abbott, 490 U.S. at 413. Abbott's language is clear: it does not limit Martinez to cases involving censorship of content.

18

practice is unknown, but it went on from at least 1994 until January 1996. The district court concluded that the practice affected Altizer, who was sending out legal mail during this time and who filed several grievances complaining about the inspection of his outgoing legal mail. The practice of opening and inspecting all outgoing legal mail at Keen Mountain has been changed to conform to VDOC policy. Outgoing legal mail is now opened only when prison staff suspect that it contains contraband.

The question in this case is whether the warden offered a "substantial governmental interest" concerning security or prison order to justify the practice of opening and inspecting every piece of outgoing legal mail. The district court considered this question carefully and reached the following conclusions: (1) the warden did "not attempt to defend" the practice of opening and inspecting every piece of the inmates' outgoing legal mail; (2) he did "not identify any important and substantial administrative interest of the prison which was furthered" by the practice; (3) he did not show that the practice "was generally necessary for prison security reasons;" and (4) he did "not offer[ ] any justification" at all for the practice of opening and inspecting "every letter from every inmate." The district court's conclusions are supported by the fact that the blanket "open and inspect" practice has been discontinued at Keen Mountain and the VDOC policy is being followed. Again, under the VDOC policy outgoing legal mail is inspected only when there are reasonable concerns about security or unlawful conduct.

I, too, believe that security and order in prisons is of critical importance. Indeed, prison authorities are granted, as they must be, substantial deference in this area. See, e.g., In re Long Term Administrative Segregation of Inmates Designated as Five Percenters , 174 F.3d 464 (4th Cir. 1999) (finding no constitutional prohibition on long-term segregation of members of purported religious group that was classified as a security threat), petition for cert. filed sub nom. Mickle v. Moore, 68 U.S.L.W. 3080 (U.S. July 19, 1999) (No. 99-131). The Supreme Court has determined, however, that the security interests in regulating outgoing prisoner mail are "of a categorically lesser magnitude" than those for controlling the flow of materials into prison. Abbott, 490 U.S. at 413. Although prison authorities may be justified in opening outgoing prisoner mail in certain circumstances, the war-

19

den here failed to offer a "substantial governmental interest" for opening all outgoing legal mail.**3** I would therefore affirm the judgment of the district court.

_____

**3** A formal policy authorizing blanket inspection of outgoing mail may be appropriate for certain classes of prisoners or for certain types of institutions. For example, the Federal Bureau of Prisons has a policy allowing inspection of outgoing general correspondence from inmates in medium and high security facilities, see 28 C.F.R.§ 540.14(c)(2), although this policy does not apply to legal mail, see 28 C.F.R. §§ 540.18(c)(1), 540.19. At any rate, a formal policy of this sort might have justified inspections of Altizer's outgoing mail.

The Commonwealth advises us in its brief that after Altizer filed this suit, he was caught trying to mail a homemade knife to a deputy clerk of the district court for the Western District of Virginia. Appellants' Br. at 35. That attempt was apparently foiled under the VDOC policy that allows inspection of outgoing mail when prison authorities believe security is threatened. My point here is that the prior blanket inspection practice at Keen Mountain cannot be sanctioned by us when the warden himself did not offer any substantial justification for it in district court.

20