**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SCOTT D. NORDSTROM,
*Plaintiff-Appellant*,

v.

CHARLES L. RYAN, Director of
ADOC; A. RAMOS, Deputy Warden;
F. HAWTHORNE,
*Defendants-Appellees*.

No. 12-15738

D.C. No.
2:11-cv-02344-
DGC-MEA

OPINION

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted
April 7, 2014—San Francisco, California

Filed August 11, 2014

Before: Barry G. Silverman, William A. Fletcher,
and Jay S. Bybee, Circuit Judges.

Opinion by Judge Silverman;
Dissent by Judge Bybee

## SUMMARY[*]

### Prisoner Civil Rights

The panel reversed the district court's dismissal, for failure to state a claim, and remanded in an action brought by an Arizona state prisoner who alleged constitutional violations when prison officials read a confidential letter he intended to send to his lawyer, instead of merely scanning and inspecting the letter for contraband.

The panel held that plaintiff's allegations that prison officials read his legal mail, that they claimed entitlement to do so, and that his right to private consultation with counsel had been chilled stated a Sixth Amendment claim. The panel also held that the allegations supported a claim for injunctive relief.

Dissenting, Judge Bybee stated that the Sixth Amendment does not prevent prison officials from reading legal letters with an eye toward discovering illegal conduct and that plaintiff also failed to allege any actual injury.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Michelle King (argued) and Joy Nissen (argued), Certified Law Student Representatives, and Gregory C. Sisk, Supervising Attorney, University of St. Thomas School of Law Appellate Clinic, Minneapolis, Minnesota; Mason Boling and Lauren E. Murphy, Certified Law Student Representatives, and Dustin E. Buehler, Supervising Attorney, University of Arkansas Federal Appellate Litigation Project, Fayetteville, Arkansas, for Plaintiff-Appellant.

Thomas C. Horne, Attorney General, and Neil Singh (argued), Assistant Attorney General, Office of the Arizona Attorney General, Phoenix, Arizona, for Amicus Curiae the State of Arizona.

Donald Specter and Corene Kendrick, Prison Law Office, Berkeley, California, for Amici Curiae American Civil Liberties Union, Prison Law Office, and Arizona Center for Disability Law.

Amy Armstrong and Natman Schaye, Tucson, Arizona, for Amicus Curiae Arizona Capital Representation Project.

Kelly A. Kszywienski, Snell & Wilmer, Phoenix, Arizona; Lawrence Fox, Yale Law School, New Haven, Connecticut, for Amicus Curiae Ethics Bureau at Yale.

Bryan A. Stevenson, Carla C. Crowder, and Benjamin H. Schaefer, Montgomery, Alabama, for Amicus Curiae the Equal Justice Initiative.

## OPINION

SILVERMAN, Circuit Judge:

Plaintiff-Appellant Scott Nordstrom is on death row in the Arizona State Prison. He alleges that when he sought to send a confidential letter – "legal mail" – to his lawyer, a prison guard actually *read* the letter, instead of merely scanning and inspecting the letter for contraband. He claims that when he protested to the guard that the letter was a confidential attorney-client communication and should not be read, the guard told him to go pound sand. Nordstrom's formal grievances were denied on the stated ground that Department of Corrections staff "is not prohibited from reading the [legal] mail to establish the absence of contraband and ensure the content of the mail is of legal subject matter."

Nordstrom then brought a 42 U.S.C. § 1983 lawsuit against Department of Corrections officials, as well as the officer who allegedly read his legal mail, seeking to enjoin them from reading his letters to his lawyer. He alleges that the defendants' conduct violates various constitutional rights, including his Sixth Amendment right to counsel. The district court dismissed the complaint at the pre-answer screening stage for failure to state a claim under any constitutional theory. *See* 28 U.S.C. § 1915A.

A prison is no ordinary gated community. It's a tough place. Corrections officials obviously have good reason to be on the lookout for contraband, escape plans, and other mischief that could jeopardize institutional security. Officials likewise have every right to *inspect* an inmate's outgoing legal mail for such suspicious features as maps of the prison yard, the times of guards' shift changes, and the like. Prison

officials know what to look for.  But *inspecting* letters and *reading* them are two different things, as the Supreme Court recognized in *Wolff v. McDonnell*, 418 U.S. 539, 576–77 (1974).  What prison officials don't have the right to do is read a confidential letter from an inmate to his lawyer.  This is because it is highly likely that a prisoner would not feel free to confide in his lawyer such things as incriminating or intimate personal information – as is his Sixth Amendment right to do – if he knows that the guards are reading his mail.

Reading legal mail – not merely inspecting or scanning it – is what Nordstrom alleges the Department of Corrections is doing, and it is what he seeks to enjoin.  We hold today that his allegations, if true, state a Sixth Amendment violation.  We reverse the dismissal of his complaint.

## BACKGROUND

In reviewing an order dismissing a case for failure to state a claim, we "take as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor." *Silva v. Di Vittorio*, 658 F.3d 1090, 1101 (9th Cir. 2011).

Nordstrom's claims against Charles L. Ryan, the ADC Director, A. Ramos, the Deputy Warden of ADC-Eyman, and F. Hawthorne, a correctional officer, center around the ADC's policies and practices concerning outgoing legal mail. Nordstrom alleges that on May 2, 2011, he prepared a letter to send to Sharmila Roy, the court-appointed lawyer representing him in the appeal of his murder conviction and death sentence.  The envelope was marked "legal mail" and was addressed to "Attorney at Law Sharmila Roy, Esq." Nordstrom notified Officer Hawthorne, who was conducting

a security walk, that he had legal mail ready to be processed. Nordstrom alleges that Hawthorne "took [the] clearly marked 'legal mail' envelope and removed the two page letter and proceeded to read the content of [the] correspondence." Nordstrom asked Hawthorne to stop reading his "attorney-client privileged correspondence." Hawthorne responded: "[D]on't tell me how to do my job; I am authorized to search legal mail for contraband as well as scan the content of the material to ensure it is of legal subject matter." Nordstrom then told Hawthorne he "was not authorized to read [the] legal letter, only inspect for contraband; seal, stamp, and log." Hawthorne again told Nordstrom he "was not in a position to tell him how to do his job" and "shoved [the] letter" back to Nordstrom. Nordstrom sealed the letter and placed it in the door, and it was gone the next morning.

Nordstrom filed a series of grievances complaining that Hawthorne read his privileged letter. His final appeal was to ADC Director Ryan. Ryan's response cited the ADC's written legal mail policy, Order 902.11, which states in relevant part:

> 1.4.2.2 *All outgoing letters to an inmate's attorney* or to a judge or court shall be brought to the mail room by the inmate, where the letter *shall not be read or censored but shall be inspected for contraband and sealed in the presence of the inmate.* All outgoing legal documents to an inmate's attorney or to a judge or court (other than letters to an inmate's attorney or to a judge or court, such as pleadings, briefs and motions) shall not be censored, but staff are not prohibited from reading such documents to the extent

necessary to establish the absence of contraband.

(Emphasis added.) In denying Nordstrom's grievance, Ryan reasoned that "[s]taff is authorized to scan and *is not prohibited from reading the mail* to establish the absence of contraband and ensure the content of the mail is of legal subject matter." (Emphasis added.)

Nordstrom alleges that Officer Hawthorne's conduct and Director Ryan's approval of that conduct "forced him to cease conveying critically sensitive information concerning necessary aspects of his case for appellate adjudication to his attorney due to [ADC]'s continued threat to read any outgoing legal correspondence."

Nordstrom filed this § 1983 action pro se alleging that the ADC's policy and practice of reading his outgoing legal mail violates his First, Sixth, and Fourteenth Amendment rights. In addition to costs, he seeks a declaration that the defendants' conduct was unconstitutional and an injunction preventing them from reading his legal mail in the future.

The district court dismissed the first amended complaint with prejudice at the pre-answer screening stage under the Prison Litigation Reform Act ("PLRA"), 28 U.S.C. §1915A.[1]

---

[1] The PLRA contains a provision requiring district courts to screen prisoner complaints before or soon after docketing if the case is "a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity." 28 U.S.C. § 1915A(a). A court must dismiss a complaint if it is "frivolous, malicious, or fails to state a claim upon which relief may be granted," or if it "seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b). The purpose of § 1915A is "to ensure that the targets of

First, the court held that Nordstrom could not state a claim for violation of his right of access to the courts because he failed to allege Hawthorne's conduct caused him actual injury. Second, it held that Nordstrom failed to state a claim for violation of his right to counsel; the court stated that he did not demonstrate that the ADC had a policy of reading legal mail or show how the "one-time occurrence" of Hawthorne reading the confidential letter "impacted the attorney-client relationship." The court also ruled that a policy permitting staff to scan legal mail is permissible. Third and finally, the district court held that Nordstrom had no cognizable free speech claim because "the reading of an inmate's legal mail, in the inmate's presence, to check for the presence of contraband or illegal activity is the type of regulation allowed for the purpose of maintaining institutional security."

## DISCUSSION

### I.  Legal Standards

We have jurisdiction pursuant to 28 U.S.C. § 1291, and we review de novo a district court's dismissal of a complaint under 28 U.S.C. § 1915A for failure to state a claim. *Resnick v. Hayes*, 213 F.3d 443, 447 (9th Cir. 2000).

Dismissal for failure to state a claim under § 1915A "incorporates the familiar standard applied in the context of failure to state a claim under Federal Rule of Civil Procedure 12(b)(6)." *Wilhelm v. Rotman*, 680 F.3d 1113, 1121 (9th Cir. 2012). To survive § 1915A review, a complaint must

---

frivolous or malicious suits need not bear the expense of responding." *Wheeler v. Wexford Health Sources, Inc.*, 689 F.3d 680, 681 (7th Cir. 2012).

"contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted)). Pro se complaints are construed "liberally" and may only be dismissed "if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.* (quoting *Silva*, 658 F.3d at 1101); *see Schucker v. Rockwood*, 846 F.2d 1202, 1203–04 (9th Cir. 1988) ("Dismissal of a pro se complaint without leave to amend is proper only if it is absolutely clear that the deficiencies of the complaint could not be cured by amendment." (internal quotation marks omitted)).

## II. Constitutional Framework

Federal courts have traditionally "adopted a broad hands-off attitude toward problems of prison administration" because "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Procunier v. Martinez*, 416 U.S. 396, 404–05 (1974), *overruled in part by Thornburgh v. Abbott*, 490 U.S. 401 (1989). Nonetheless, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," *Turner v. Safley*, 482 U.S. 78, 84 (1987), and a court will intervene "[w]hen a prison regulation or practice offends a fundamental constitutional guarantee," *Martinez*, 416 U.S. at 405.

The Supreme Court spoke on the issue of the inspection of prisoner legal mail in *Wolff v. McDonnell*, 418 U.S. 539 (1974). In *Wolff*, the Supreme Court upheld a Nebraska prison regulation that allowed prison officials to open and inspect – but not *read* – legal mail sent to an inmate:

> As to the ability to open the mail in the presence of inmates, this could in no way constitute censorship, *since the mail would not be read.* Neither could it chill such communications, *since the inmate's presence insures that prison officials will not read the mail*. The possibility that contraband will be enclosed in letters, even those from apparent attorneys, surely warrants prison officials' opening the letters . . . . [W]e think that petitioners, by acceding to a rule whereby the inmate is present when mail from attorneys is inspected, have done all, and perhaps even more, than the Constitution requires.

*Id.* at 577 (emphasis added).

Following *Wolff*, courts have analyzed claims regarding the confidentiality of attorney-inmate communications under various constitutional principles, including the First Amendment right to freedom of speech and the Fourteenth Amendment rights to due process and access to the courts, or some combination of these rights.[2] Courts also have

---

[2] *See, e.g.*, *Guajardo-Palma v. Martinson*, 622 F.3d 801, 802 (7th Cir. 2010) (declining to analyze prisoner legal mail claim under the First Amendment and instead basing "the concern with destroying that [attorney-client] confidentiality on the right of access to the courts" or "on the due process right to a fair hearing"); *Al-Amin v. Smith*, 511 F.3d 1317, 1334–35 (11th Cir. 2008) (concluding that a prison policy of opening a prisoner's legal mail outside of his presence violated his "First Amendment free speech right to communicate with his attorneys by mail"); *Jones v. Brown*, 461 F.3d 353, 359 (3d Cir. 2006) ("A state pattern and practice, or . . . explicit policy, of opening legal mail outside the

recognized that "while most cases brought by prisoners are civil . . . [a] practice of prison officials reading mail between a prisoner and his lawyer in a criminal case would raise serious issues under the Sixth Amendment . . . which guarantees a right to counsel in criminal cases." *Guajardo-Palma v. Martinson*, 622 F.3d 801, 803 (7th Cir. 2010); *see also Merriweather v. Zamora*, 569 F.3d 307, 317 (6th Cir. 2009) ("[O]pening properly marked legal mail alone . . . implicates both the First and Sixth Amendments because of the potential for a 'chilling effect.'"); *Altizer v. Deeds*, 191 F.3d 540, 549 n.14 (4th Cir. 1999) ("Inspecting an inmate's legal mail may implicate the inmate's Sixth Amendment right to communicate freely with his attorney in a criminal case.").

Nordstrom alleges that the defendants' conduct interfered with attorney-client communications related to the appeal of his murder conviction and death sentence. His claims therefore fall squarely within the scope of the Sixth Amendment right to counsel, and we do not consider whether he also states claims for infringement of his rights to free speech and/or access to the courts.

## III.     Sixth Amendment Right to Counsel

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI; *see also Gideon v. Wainwright*, 372 U.S. 335, 342–43 (1963) (holding that Sixth Amendment right to counsel extends to state court proceedings through the Fourteenth Amendment). The right to counsel "is a fundamental

---

presence of the addressee inmate . . . impinges upon the inmate's right to freedom of speech.").

component of our criminal justice system," and "[l]awyers in criminal cases are necessities, not luxuries." *United States v. Cronic*, 466 U.S. 648, 653 (1984) (internal quotation marks omitted). "When the government deliberately interferes with the confidential relationship between a criminal defendant and defense counsel, that interference violates the Sixth Amendment right to counsel if it substantially prejudices the criminal defendant." *Williams v. Woodford*, 384 F.3d 567, 584–85 (9th Cir. 2004); *see United States v. Irwin*, 612 F.2d 1182, 1186–87 (9th Cir. 1980).

A criminal defendant's ability to communicate candidly and confidentially with his lawyer is essential to his defense. In American criminal law, the right to privately confer with counsel is nearly sacrosanct. *See Adams v. Carlson*, 488 F.2d 619, 631 (7th Cir. 1973). It is obvious to us that a policy or practice permitting prison officials to not just inspect or scan, but to *read* an inmate's letters to his counsel is highly likely to inhibit the sort of candid communications that the right to counsel and the attorney-client privilege are meant to protect. As one court put it, "[i]t is well established that an accused does not enjoy the effective aid of counsel if he is denied the right of private consultation with him." *Coplon v. United States*, 191 F.2d 749, 757 (D.C. Cir. 1951); *see Mastrian v. McManus*, 554 F.2d 813, 821 (8th Cir. 1977). It takes no stretch of imagination to see how an inmate would be reluctant to confide in his lawyer about the facts of the crime, perhaps other crimes, possible plea bargains, and the intimate details of his own life and his family members' lives, if he knows that a guard is going to be privy to them, too.

Other courts have come to similar conclusions. *See, e.g.*, *Lemon v. Dugger*, 931 F.2d 1465, 1468 (11th Cir. 1991) (recognizing inmate's "constitutional right not to have his

mail read" and holding that inmate stated a claim where a prison official read a letter from his death penalty appellate attorney in his presence); *Al-Amin*, 511 F.3d at 1323 n.13 ("Nor do defendants deny that the law is well-established that Al-Amin has a constitutional right that precludes them from reading Al-Amin's attorney mail."); *see also, e.g.*, *Peterson v. Arpaio*, No. CV04-2276-PHX-SMM-LOA, 2006 WL 3736060, at *4 (D. Ariz. Nov. 21, 2006) ("Prisoners have a constitutional right to have their legal mail delivered to them uncensored and unread.").

The defendants contend that they are permitted to read Nordstrom's legal mail as long as they do so in his presence. But they fail to explain how that practice ameliorates the chilling effect likely to result from an inmate's knowledge that every word he writes to his lawyer may be intercepted by prison guards and possibly used against him. Rather, the practice of requiring an inmate to be present when his legal mail is opened is a measure designed to *prevent* officials from reading the mail in the first place. *See Wolff*, 418 U.S. at 577 (opening attorney mail in the presence of the inmate could not "chill such communications, since the inmate's presence insures that prison officials will not read the mail"); *see also, e.g.*, *Gardner v. Howard*, 109 F.3d 427, 431 (8th Cir. 1997) ("The policy that incoming confidential legal mail should be opened in inmates' presence . . . serves the prophylactic purpose of assuring them that confidential attorney-client mail has not been improperly read in the guise of searching for contraband.").

We emphasize that nothing prevents the ADC from *inspecting* an inmate's outgoing mail, in his presence, to make sure that it does not contain, for example, a map of the prison yard, the time of guards' shift changes, escape plans,

or contraband. What the Constitution does *not* permit, however, is *reading* outgoing attorney-client correspondence. And by the way, neither does the ADC's own regulation. Order 902.11.1.4.2.2 specifically states that "[a]ll outgoing letters to an inmate's attorney . . . shall not be read or censored but shall be inspected for contraband and sealed in the presence of the inmate."**[3]** While a prison regulation does not equate to a constitutional right, it just goes to show that even the ADC understands that legal mail should not be messed with unnecessarily.

Were Nordstrom challenging a conviction following an improper intrusion into the attorney-client relationship, we would examine whether the violation caused prejudice requiring the reversal of the conviction. *See Weatherford v. Bursey*, 429 U.S. 545, 558 (1977); *Irwin*, 612 F.2d at 1185–89. Nordstrom's case, however, is a civil rights lawsuit aimed at enjoining the continuation of an unconstitutional practice. The harm Nordstrom alleges is not that tainted evidence was used against him but that his right to privately confer with counsel has been chilled. This is a plausible consequence of the intentional reading of his confidential legal mail. *Cf. Weatherford*, 429 U.S. at 554 n.4 ("One threat to the effective assistance of counsel posed by government interception of attorney-client communications lies in the inhibition of free exchanges between defendant and counsel because of the fear of being overheard.").

---

**[3]** The regulation further states that, in contrast to letters, other "outgoing legal documents . . . such as pleadings, briefs and motions," may be read "to the extent necessary to establish the absence of contraband." This portion of 902.11.1.4.2.2 is not implicated because Nordstrom specifically alleges that Hawthorne read his confidential legal letter.

In sum, Nordstrom's allegations that prison officials read his legal mail, that they claim entitlement to do so, and that his right to private consultation with counsel has been chilled state a Sixth Amendment claim.

## IV.      Injunctive Relief

Nordstrom's allegations also support a claim for injunctive relief.  A plaintiff seeking prospective injunctive relief "must demonstrate 'that he is realistically threatened by a *repetition* of [the violation].'" *Armstrong v. Davis*, 275 F.3d 849, 860–61 (9th Cir. 2001) (alteration in original) (quoting *City of L.A. v. Lyons*, 461 U.S. 95, 109 (1983)), *abrogated on other grounds by Johnson v. California*, 543 U.S. 499, 504–05 (2005).  A threat of repetition can be shown "at least two ways." *Id.* at 861.  "First, a plaintiff may show that the defendant had, at the time of the injury, a written policy, and that the injury 'stems from' that policy." *Id*.  "Second, the plaintiff may demonstrate that the harm is part of a 'pattern of officially sanctioned . . . behavior, violative of the plaintiffs' [federal] rights.'"  *Id.* (alterations in original) (quoting *LaDuke v. Nelson*, 762 F.2d 1318, 1324 (9th Cir. 1985)).

Nordstrom alleges that the ADC has a policy and practice of reading his outgoing legal mail.   He supports this allegation with the grievance appeal response from Director Ryan that states that "[s]taff is . . . not prohibited from reading the mail to establish the absence of contraband and ensure the content of the mail is of legal subject matter." This statement, signed by Director Ryan himself, supports Nordstrom's allegations that Hawthorne's conduct was not simply a one-time mistake or confusion over the contours of the ADC policy.   Inasmuch as Nordstrom remains

incarcerated and alleges the ADC Director has personally informed him that prison officials are permitted to read his legal mail, he has adequately alleged the threatened repetition of the alleged Sixth Amendment violation.

## CONCLUSION

We **REVERSE** the district court's dismissal for failure to state a claim and **REMAND** for further proceedings.

---

BYBEE, Circuit Judge, dissenting:

Scott D. Nordstrom alleges that, on one occasion during his seventeen-year incarceration, an Arizona Department of Corrections (ADC) officer read a single letter he had written to his attorney. Nordstrom claims that this one event prejudiced his direct appeal, although he cannot explain how.

Based on these allegations, the majority concludes that Nordstrom has adequately pleaded a violation of his Sixth Amendment right to counsel. I believe the majority is twice wrong. First, the majority has misread *Wolff v. McDonnell*, 418 U.S. 539 (1974), to hold that prison officials may not read legal letters, even to the limited extent necessary to detect illegal conduct. *See* Maj. Op. at 14. Second, the majority disregards *Williams v. Woodford*, 384 F.3d 567 (9th Cir. 2004), by holding that an inmate need not show substantial prejudice to state a right-to-counsel claim, as long as this court thinks that such prejudice is likely. *See* Maj. Op. at 14.

In my view, the Sixth Amendment does not prevent prison officials from reading legal letters with an eye toward discovering illegal conduct. Furthermore, claims under the Sixth Amendment require proof of actual injury, and Nordstrom does not allege any. I respectfully dissent.

I

Nordstrom's claims arise out of ADC's alleged mishandling of one legal letter. ADC maintains a written policy regarding the processing of outgoing legal mail. It provides, in relevant part, as follows:

> 1.1 Inmates shall identify outgoing legal mail by writing "Legal Mail" on the lower left-hand corner of the envelope. . . .
>
> . . .
>
> 1.4.2.2 All *outgoing letters* to an inmate's attorney or to a judge or court shall be brought to the mail room by the inmate, where the letter shall not be read or censored but shall be inspected for contraband and sealed in the presence of the  inmate. All *outgoing legal documents* to an inmate's attorney or to a judge or court (other than letters to an inmate's attorney or to a judge or court, such as pleadings, briefs and motions) shall not be censored, but staff are not prohibited from reading such documents to the extent necessary to establish the absence of contraband.

Department Order 902:11 (emphasis added). ADC's policy thus distinguishes between outgoing legal *letters*, which "shall not be read or censored but shall be inspected for contraband," and outgoing legal *documents*, which "shall not be censored" but may be read.

Nordstrom claims that ADC has a pattern and practice of reading his legal letters in violation of its own written policy, which forbids the reading of such letters. Specifically, Nordstrom alleges that on May 2, 2011, he wrote a letter to Sharmila Roy, his court-appointed attorney. The letter was marked "legal mail" and was addressed to Roy. When Nordstrom notified Officer Hawthorne that he had legal mail to send, Officer Hawthorne allegedly "removed the two page letter and proceeded to read the content of [the] correspondence." Nordstrom asked Officer Hawthorne to stop reading the letter approximately fifteen seconds later. Officer Hawthorne refused, explaining that he "[was] authorized to search legal mail for contraband as well as scan the content of the material to ensure it [was] of legal subject matter." Nordstrom again protested. Officer Hawthorne told Nordstrom that he "was not in a position to tell him how to do his job" and "shoved [the] letter" in Nordstrom's door. Nordstrom then sealed the envelope and placed it in the door. The letter was gone the next day.

Nordstrom initiated the four-step grievance process. At the fourth and final step of the grievance process, Nordstrom appealed to ADC Director Ryan. After quoting ADC's legal mail policy, Ryan stated that "[s]taff is authorized to scan and is not prohibited from reading the mail to establish the absence of contraband and ensure the content of the mail is of legal subject matter." In this statement, Ryan referenced only "the mail," blurring the important distinction between legal

letters and legal documents under ADC's written policy. Ryan thus concluded that no action was warranted in response to Nordstrom's grievance.

Nordstrom filed a civil rights complaint in federal district court. In the complaint, Nordstrom alleges that ADC violated his First, Sixth, and Fourteenth Amendment rights. The district court dismissed the complaint at the screening stage under the Prison Litigation Reform Act (PLRA), 28 U.S.C. § 1915A, for failure to state a claim. The district court carefully outlined the deficiencies in the complaint, explaining that the First Amendment does not prohibit an officer from reading legal mail in an inmate's presence with an eye to determining whether it advances illegal conduct, that Nordstrom had failed to allege the actual injury necessary for an access-to-court claim, and that he had failed to allege the requisite prejudice to state a right-to-counsel claim. The district court granted Nordstrom leave to file an amended complaint to cure his deficient allegations.

Nordstrom then filed his first amended complaint, again claiming that ADC violated his First, Sixth, and Fourteenth Amendment Rights. The first amended complaint alleges that ADC's practice of reading Nordstrom's outgoing legal letters "has forced him to cease conveying critically sensitive information concerning necessary aspects of his case for appellate adjudication to his attorney." He provides no hint as to what type of information this might be. Nordstrom acknowledges, however, that he has not yet suffered prejudice from ADC's allegedly unconstitutional practice, stating that "[he] is incapable of prophesying . . . the prejudicial effects of [ADC's] actions . . . in the adjudication of [his] appeal." Noting Nordstrom's failure to cure the deficiencies identified

in the original complaint, the district court dismissed the first amended complaint with prejudice for failure to state a claim.

II

The opening and inspecting of inmates' mail raises important concerns under the First, Sixth, and Fourteenth Amendments. *See Thornburgh v. Abbott*, 490 U.S. 401 (1989) (prisoner receipt of outside publications); *Turner v. Safley*, 482 U.S. 78 (1987) (inmate-to-inmate correspondence); *Wolff v. McDonnell*, 418 U.S. 539 (1974) (incoming mail to inmates from attorneys); *Procunier v. Martinez*, 416 U.S. 396 (1974) (incoming and outgoing prisoner non-legal mail), *overruled in part by Thornburgh*, 490 U.S. 401. Although an inmate's "rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections." *Wolff*, 418 U.S. at 555. After *Turner*, "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89.

Of particular concern is "the extent to which prison authorities can open and inspect incoming mail from attorneys to inmates," *Wolff*, 418 U.S. at 574, and similar "outgoing correspondence," *Abbott*, 490 U.S. at 413. Although "[t]he implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials," *id.*,

> legitimate governmental interest in the order and security of penal institutions justifies the imposition of certain restraints on inmate

correspondence. Perhaps the most obvious example of justifiable censorship of prisoner mail would be refusal to send or deliver letters concerning escape[] plans or containing other information concerning proposed criminal activity, whether within or without the prison.

*Martinez*, 416 U.S. at 412–13.

My disagreement with the majority begins with its reading of *Wolff v. McDonnell*. There, the Supreme Court granted review to consider a Nebraska prison regulation, which provided that "[a]ll incoming and outgoing mail will be read and inspected," without exception for legal letters. *Wolff*, 418 U.S. at 574. Wolff maintained that this policy violated his First, Sixth, and Fourteenth Amendment rights. *Id*. at 575. Before the Supreme Court decided the case, however, Nebraska prison officials altered their position, conceding that they could not read legal letters. Accordingly, the Supreme Court did not consider Nebraska's written regulation. Instead, prison officials contended that they could open legal letters as long as they did so in the inmate's presence. As the Supreme Court put it, "[t]he *narrow* issue thus presented [was] whether letters determined or found to be from attorneys may be opened by prison authorities in the presence of the inmate." *Id*. (emphasis added).

The Court first observed that "the constitutional status of the rights asserted . . . [was] far from clear." *Id*. Although "First Amendment rights of correspondents with prisoners may protect against the *censoring* of inmate mail, when not necessary to protect legitimate governmental interests, [the Supreme] Court ha[d] not yet recognized First Amendment

rights of prisoners in this context."**[1]** *Id.* at 575–76 (emphasis added) (citations omitted). And, in any event, "freedom from censorship is not equivalent to freedom from inspection or perusal." *Id*. at 576. The Court expressed similar skepticism regarding Wolff's Sixth and Fourteenth Amendment claims. *Id*.

In the end, the Court concluded that it did not need to decide "which, if any, of the asserted rights [were] operative" in Wolff's case. *Id*. The Court simply "assum[ed] some constitutional right [was] implicated," *id*., and found the prison's policy constitutionally permissible:

> As to the ability to open the mail in the presence of inmates, *this could in no way constitute censorship*, since the mail would not be read. *Neither could it chill such communications*, since the inmate's presence insures that prison officials will not read the mail. The possibility that contraband will be enclosed in letters, even those from apparent attorneys, surely warrants prison officials' opening the letters. . . . [W]e think that [prison officials], by acceding to a rule whereby the inmate is present when mail from attorneys is inspected, have done all, and perhaps even more, than the Constitution requires.

*Id*. at 577 (emphasis added).

---

**[1]** Forty years have passed since *Wolff*, and the Supreme Court still has not recognized this First Amendment right.

According to the majority here, "[w]hat prison officials don't have the right to do is read a confidential letter from an inmate to his lawyer." Maj. Op. at 5. But *Wolff* doesn't say that. The majority makes such a broad statement in part because it reads *Wolff*'s holding—that prison officials may open legal letters in an inmate's presence—as "a measure designed to *prevent* officials from reading the mail in the first place." *Id*. at 13. Others have taken this position before. *Gardner v. Howard*, 109 F.3d 427, 431 (8th Cir. 1997) ("The policy that incoming confidential legal mail should be opened in inmates' presence . . . serves the prophylactic purpose of assuring them that confidential attorney-client mail has not been improperly read in the guise of searching for contraband."); *see also Stanley v. Vining*, 602 F.3d 767, 773 (6th Cir. 2010) (Cole, J., concurring in part and dissenting in part) ("[T]he *Wolff* Court specifically recognized that the rationale behind prohibiting prison officials from opening legal mail outside the recipient prisoner's presence was to deter the officials from reading such mail."). But I believe they, like the majority, are in error.

The touchstone of *Wolff*'s analysis is censorship and the chilling of legal communications, not reading. *See Wolff*, 418 U.S. at 575 (noting that "First Amendment rights of correspondents with prisoners may protect against the *censoring* of inmate mail" but that "freedom from censorship is not equivalent to freedom from inspection or perusal"); *id*. at 577 ("As to the ability to open the mail in the presence of inmates, *this could in no way constitute censorship*, since the mail would not be read. *Neither could it chill such*

*communications*, since the inmate's presence insures that prison officials will not read the mail.").[2]

Furthermore, the Supreme Court did not equate *reading* with *chilling* or *censoring* legal communications. Rather, the Court reasoned that if prison officials were no longer reading legal letters—Nebraska's mid-course change in strategy—there could be neither censorship nor chilling of legal communications. This does not mean that if prison officials do read legal letters, it follows that there must be censorship or the chilling of legal communications, as the majority suggests. Indeed, the Supreme Court acknowledged this fact when it emphasized that "freedom from censorship is *not* equivalent to freedom from inspection or perusal," *id*. at 576, and suggested that Nebraska had "done all, *and perhaps even more*, than the Constitution requires," *id*. at 577 (emphases added). Thus, under *Wolff*, reading is a necessary, but not sufficient, condition for censorship and the chilling of legal communications. By disregarding the logical relationship between these concepts, the majority commits the fallacy of denying the antecedent and arrives at a conclusion that is at odds with *Wolff* itself, which recognized that "perusal" of legal letters is permissible, at least under certain circumstances.

In the majority's view, the "reading" of legal letters is categorically impermissible, Maj. Op. at 5, but the "inspecting" of legal letters is fair game, *id*. at 13–14. In fact, the majority asserts that "nothing prevents the ADC from

---

[2] The Court's focus on censorship of the mail is quite understandable. Just two months earlier, the Court had decided *Procunier v. Martinez*, which dealt with "testing the constitutionality of prisoner mail censorship regulations." 416 U.S. at 407.

*inspecting* an inmate's outgoing mail, in his presence, to make sure that it does not contain, for example, a map of the prison yard, the time of guards' shift changes, escape plans, or contraband." *Id*. If there is no overlap between reading and inspecting, however, how could a prison guard possibly inspect a legal letter for escape plans without reading any of its content? He couldn't, of course, because "inspecting" implies some measure of reading in this context. *See Webster's Third New International Dictionary* 1170 (1986) (defining "inspect" as "to view closely and critically" and to "examine with care"). Inspecting things, such as meat or tires, requires a different set of criteria or data points than inspecting written material. Unless we expect prison officials to look only for illegal watermarks, unauthorized use of copyrighted fonts, or poisonous ink, inspecting officials are going to have to read for comprehension. If they are to be able to interdict "letters concerning escape[] plans or containing other information concerning proposed criminal activity," including "encoded messages," we will have to tolerate some reading of the mails. *Martinez*, 416 U.S. at 413.

Reading is the process by which one examines and grasps the meaning of printed characters, words, or sentences. *See id*. at 1889 (defining "read" as "to look at or otherwise scan (as letters or other symbols representing words or sentences) with mental formulations of the words or sentences represented"). The verb "to read" has many synonyms, including "to peruse," the very action that the Supreme Court deemed permissible in *Wolff*. *See Wolff*, 418 U.S. at 576; *see also Webster's Third New International Dictionary* 1688 (defining "peruse" as "*to read through or read over* with some attention and typically for the purpose of discovering or noting one or more specific points" (emphasis added)). We cannot draw a constitutional distinction between "reading"

and "perusing." Although, in ordinary conversation, we may indicate our quick review or casual reading of material when we say we "perused" it, that word more often than not excuses our lack of attention or interest in the material. Prison officials looking for escape plans, criminal activity, or coded messages, cannot be so inattentive.

Obviously, there are levels of reading, and a prison guard need not parse each word of a legal letter the way he would dissect his favorite novel or the way we would scrutinize a dense statute. But nothing in the Supreme Court's cases or in our precedent prevents a prison guard from reading a legal letter to the extent necessary to detect illegal conduct. As the Supreme Court has recognized, such limited reading—or inspecting or perusing or whatever else you want to call it—does not amount to censorship or the chilling of legal communications. *Wolff*, 418 U.S. at 576. Drawing constitutional lines between reading written materials, on the one hand, and perusing or inspecting them, on the other, is a fruitless task.

In my view, some reading of legal letters is permissible, absent censorship and the chilling of legal communications. *See Stanley*, 602 F.3d at 770 ("Although [an inmate] has a First Amendment right to be free from unreasonable mail censorship, he has no First Amendment right that prevents a guard from opening his mail in his presence and reading it with an eye to determining if illegal conduct is afoot."); *Altizer v. Deeds*, 191 F.3d 540, 549 (4th Cir. 1999) ("[A]lthough an inmate's First Amendment rights *may* be violated when his outgoing mail is censored, his First Amendment rights are not violated when his outgoing mail is simply opened and inspected for, among other things, contraband." (footnote omitted)). This view is consistent with

the traditional "hands-off attitude" that federal courts have adopted toward problems of prison administration, *Martinez*, 416 U.S. at 404, while simultaneously "tak[ing] cognizance of the valid constitutional claims of prison inmates," *Turner*, 482 U.S. at 84. "[T]he prison employee who opens the letter will have to glance at the content to verify its bona fides. . . . The approach sketched in *Wolff* to lawyer-prisoner mail may not be ideal, but it is the best that has been suggested, and that's good enough." *Guajardo-Palma v. Martinson*, 622 F.3d 801, 805 (7th Cir. 2010).

## III

In the years following *Wolff*, the lower courts have attempted to refine the constitutional analysis of prisoners' mail rights. The courts have primarily examined three constitutional rights in cases arising out of the reading of legal letters: the First Amendment right of speech,[3] the Sixth

---

[3] *See*, *e.g.*, *Stanley*, 602 F.3d at 770 ("[An inmate] has no First Amendment right that prevents a guard from opening his mail in his presence and reading it with an eye to determining if illegal conduct is afoot."); *Al-Amin v. Smith*, 511 F.3d 1317, 1333–34 (11th Cir. 2008) (holding that a pattern and practice of opening, but not reading, legal mail outside an inmate's presence impinges the First Amendment); *Jones v. Brown*, 461 F.3d 353, 359 (3d Cir. 2006) (holding that opening, but not reading, of incoming legal mail outside an inmate's presence violates the right of speech); *Altizer*, 191 F.3d at 549 ("[A]lthough an inmate's First Amendment rights *may* be violated when his outgoing mail is censored, his First Amendment rights are not violated when his outgoing mail is simply opened and inspected for, among other things, contraband."); *Brewer v. Wilkinson*, 3 F.3d 816, 825 (5th Cir. 1993) (holding that opening and inspecting incoming legal mail outside an inmate's presence does not violate the First Amendment).

Amendment right to counsel,[4] and the Fourteenth Amendment right of access to courts.[5] Because this appeal involves a legal letter in a criminal case, I agree with the majority that it should be analyzed as a right-to-counsel claim. Maj. Op. at 11. But unlike the majority, I do not believe that Nordstrom has stated such a claim.

Neither Nordstrom nor the majority can point to any case in which an appellate court has found a violation of the right to counsel on analogous facts.[6] As a result, first principles

---

[4] *See*, *e.g.*, *Guajardo-Palma*, 622 F.3d at 803 ("A practice of prison officials reading mail between a prisoner and his lawyer in a criminal case would raise serious issues under the Sixth Amendment."); *Merriweather v. Zamora*, 569 F.3d 307, 317 (6th Cir. 2009) ("[O]pening properly marked legal mail alone, without doing more, implicates both the First and Sixth Amendments because of the potential for a chilling effect." (internal quotation marks omitted)); *Altizer*, 191 F.3d at 549 n.14 ("Inspecting an inmate's legal mail may implicate the inmate's Sixth Amendment right to communicate freely with his attorney in a criminal case.").

[5] *See*, *e.g.*, *Guajardo-Palma*, 622 F.3d at 802, 805 (rejecting the right-of-speech analysis in favor of an access-to-courts analysis and finding no violation absent prejudice); *Al-Amin*, 511 F.3d at 1333 (finding no access-to-courts violation absent actual injury); *Brewer*, 3 F.3d at 825 (holding that opening and inspecting incoming legal mail outside an inmate's presence does not violate the right of access to courts).

[6] The majority asserts that "[o]ther courts have come to similar conclusions" in their right-to-counsel analyses. Maj. Op. at 12. But the two cases upon which the majority relies, *Lemon v. Dugger*, 931 F.2d 1465 (11th Cir. 1991), and *Al-Amin v. Smith*, reached no such conclusion, at least not under the Sixth Amendment. In *Lemon*, the Eleventh Circuit appears to have recognized that an inmate has a constitutional right not to have his legal letters read, 931 F.3d at 1468, but the court never relied on any specific constitutional right, much less the Sixth Amendment right to counsel. Likewise, in *Al-Amin*, the prison officials conceded that they could not read legal letters, and the court "address[ed] only Al Amin's

must guide our analysis. In *Weatherford v. Bursey*, 429 U.S. 545 (1977), a criminal defendant claimed that the use of an undercover agent violated his right to counsel at trial. The undercover agent had met with the defendant and his attorney on two occasions but had not subsequently revealed anything said or done at the meetings. *Id.* at 547–48, 555. Rejecting the criminal defendant's claim, the Supreme Court held that "unless [the undercover agent] communicated the substance of the . . . conversations and thereby created at least a realistic possibility of injury to [the criminal defendant] or benefit to the State, there can be no Sixth Amendment violation." *Id.* at 558.

We relied on *Weatherford* in rejecting an inmate's Sixth Amendment claim in *Williams v. Woodford*, 384 F.3d 567 (9th Cir. 2004). There, a habeas petitioner alleged a violation of his right to counsel based on jailhouse monitoring of his conversations with visitors and the interception of a document revealing the appointment of a psychiatrist as a defense expert. *Id.* at 584. We held that "[w]hen the government deliberately interferes with the confidential relationship between a criminal defendant and defense counsel, that interference violates the Sixth Amendment right to counsel *if it substantially prejudices* the criminal defendant." *Id.* at 584–85 (emphasis added). We then proceeded to define "substantial prejudice" in this context: "Substantial prejudice results from the introduction of evidence gained through the interference against the defendant at trial, from the

---

'mail opening' claim." 511 F.3d at 1323 n.13. The court found that a pattern and practice of opening, but not reading, legal mail *outside* an inmate's presence impinges First and Fourteenth Amendment rights. *Id.* at 1332–35. The court did not mention or rely upon the right to counsel in its decision.

prosecution's use of confidential information pertaining to defense plans and strategy, and from other actions designed to give the prosecution an unfair advantage at trial." *Id*. at 585. In other words, we held that a criminal defendant must show actual injury to state a claim based on an alleged violation of his right to counsel. *Cf. Gomez v. Vernon*, 255 F.3d 1118 (9th Cir. 2001) (upholding sanctions where prison employees copied inmate correspondence with their attorneys and provided it to counsel for the state).

The majority states that "[w]ere Nordstrom challenging a conviction following an improper intrusion into the attorney-client relationship, we would examine whether the violation caused prejudice requiring the reversal of the conviction." Maj. Op. at 14. But, the majority continues, "[t]he harm Nordstrom alleges is not that tainted evidence was used against him but that his right to privately confer with counsel has been chilled." *Id.* The majority does not tell us in any concrete terms what type of communication Nordstrom has kept to himself, though it assures us that such chilling is "highly likely" and that "[i]t takes no stretch of imagination" to see how *some* inmates *might* be reluctant to communicate the facts of their crimes or their personal histories if they knew that a prison official might be privy to that information as well. *Id*. at 12.

There are three problems with the majority's prejudice analysis. First, the majority disregards the actual allegations of the first amended complaint. Nordstrom does not allege that he was reluctant to disclose the details of his life to his attorney. Nor does he allege that he felt unable to discuss the crime. Nordstrom alleges that ADC "has forced him to cease conveying critically sensitive information concerning necessary aspects of his case for appellate jurisdiction to his

attorney." Although these are good, legal words, they do not provide any indication of the basis for Nordstrom's claim. Nordstrom does not specify, for example, the *type* of information he was unable to convey—e.g., information regarding his personal background—or the aspect of his case to which that information pertained—e.g., sentencing. Of course, Nordstrom need not detail the *content* of that information in his complaint, but he must allege some factual support to enable the court to evaluate the substantiality of the prejudice he suffered. It is telling that when Nordstrom filed his first amended complaint on February 10, 2012, more than ten months after Officer Hawthorne allegedly read the letter, Nordstrom still could not articulate any actual injury. Instead, Nordstrom wrote that he was "incapable of prophesying . . . the prejudicial effects of [ADC's] actions . . . in the adjudication of [his] appeal." Such vague allegations do not suffice, especially when the district court permitted Nordstrom to amend his complaint to cure this very defect.

Second, rather than evaluating the specific effect that the reading of this letter had on Nordstrom, the majority hypothesizes about the effect that reading legal letters might have on inmates in general. For example, the majority tells us "[i]t is obvious" that a policy of reading legal letters "is highly likely to inhibit the sort of candid communications that the right to counsel and the attorney-client privilege are meant to protect." Maj. Op. at 12. The need for this type of speculation is hardly surprising because Nordstrom himself has not alleged any actual injury. But by engaging in such probabilistic reasoning, the majority effectively lowers the standard of prejudice for right-to-counsel claims from "substantial prejudice" to "imaginable prejudice." As a result, the majority's reasoning is plainly inconsistent with our Sixth Amendment precedent. *See Williams*, 384 F.3d at 584–85.

Third, the majority ignores the fact that Nordstrom alleges only a one-time incident despite having now been incarcerated for seventeen years. As the Seventh Circuit has recognized, the chilling effect of an isolated interference with legal mail "is likely to be nil." *Guajardo-Palma*, 622 F.3d at 805. This is true in part because an inmate generally has alternate means of communicating with his attorney. For example, ADC regulations permit inmates to engage in unmonitored and unrecorded legal phone calls. *See* Department Order 902.12. Such alternate means of communication may be imperfect, but they minimize the risk that criminal defendants will be unable to transmit necessary information to their attorneys. And although the reading of a legal letter on one occasion may bother or offend an inmate, this is not enough to show a right-to-counsel violation. *See Stanley*, 602 F.3d at 770 ("In order to state [a right-to-counsel] claim there must be something more than an allegation that a guard 'read' [an inmate's] 'legal mail' in his presence and that he was offended or believed this act to be a violation of a state prison regulation."). He must allege chilling sufficient "to give the prosecution an unfair advantage at trial." *Williams*, 384 F.3d 585. Nordstrom has failed to do so here.[7]

---

[7] The majority finds that the general chilling of legal communications, without more, may constitute substantial prejudice under *Williams*. Maj. Op. at 11–15. I am unconvinced. Admittedly, the Supreme Court in *Wolff* discussed the potential chilling effect that the reading of legal letters might have on legal communications. *See* 418 U.S. at 577. But *Wolff*'s discussion of constitutional principles was completely undifferentiated. *Id*. at 574–77. The Court simply "assum[ed] *some* constitutional right [was] implicated," *id*. at 576 (emphasis added), including, perhaps, a right under the First Amendment, where chilling has long been a concern. The concept of chilling seems ill-suited to the Sixth Amendment context, where the inmate must show substantial prejudice resulting from

Proof of an official policy of reading an inmate's legal letters *beyond the extent necessary to detect illegal conduct* might be sufficient to show substantial prejudice. *See Guajardo-Palma*, 622 F.3d at 805. But that is not what Nordstrom alleges in his amended complaint. Nordstrom alleges that ADC arbitrarily *violated* its own written policy. Thus, Nordstrom's claim is based on a pattern and practice of violating his right to counsel, a pattern and practice that consists entirely of Officer Hawthorne's conduct on the night of May 2, 2011.[8] This isolated event cannot serve as the factual basis for a pattern or practice claim. *See id*. at 805 (finding no prejudice where a prison official opened nine legal letters outside the inmate's presence). It's not a pattern or practice at all. As a result, Nordstrom has failed to state a right-to-counsel claim, and the district court did not abuse its discretion by dismissing the first amended complaint with prejudice. *See Okwu v. McKim*, 682 F.3d 841, 844 (9th Cir. 2012); *United States ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1058 (9th Cir. 2011) ("The district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." (internal quotation marks, citations, and alteration omitted)).

---

deliberate governmental interference with the confidential relationship between the inmate and his attorney. Even assuming that chilling of legal communications is an appropriate measure of substantial prejudice in the Sixth Amendment context, the inmate would need to show chilling of a particular kind, i.e., chilling that "give[s] the prosecution an unfair advantage at trial." *Williams*, 384 F.3d at 585.

[8] Although we have an obligation to liberally construe pro se complaints, *Wilhelm v. Rotman*, 680 F.3d 1113, 1121 (9th Cir. 2012), we cannot contradict the clear, repeated allegations of the complaint.

IV

The majority is correct that prisons are a tough place. Maj. Op. at 4. And because of the majority's decision today, they are about to get a little tougher. Prison officials are "responsible for maintaining internal order and discipline," as well as "securing their institutions against unauthorized access or escape." *Martinez*, 416 U.S. at 404. To protect individuals in and outside the prison, prison officials must be allowed to read legal letters to the extent necessary to detect illegal conduct. By preventing reading in this limited sense, the majority has hamstrung prison officials' ability to do their job.

Moreover, when a prison official crosses the line, the inmate must show that he—and not some hypothetical inmate—has suffered substantial prejudice in order to state a claim under the Sixth Amendment. Nordstrom has not shown that the reading of this one letter had any impact on his criminal appeal. I would affirm the judgment of the district court.

I respectfully dissent.